# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| | ) | 2:04-cr-0233 |
| v. | ) | |
| | ) | |
| CLARENCE M. GREEN, JR., | ) | Chief Judge Mark R. Hornak |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Sentencing in a criminal case is the most weighty and significant obligation of a federal trial court. The interests and issues involved are at the highest levels of importance and consequence. And many times, they implicate complex and convoluted questions of law.

This particular case involves several just such intricate questions, which the Court is obligated to consider and untangle in turn. To begin with, the Court must apply the nuanced and at times confounding[1] "categorical approach" to determine whether the advisory "career offender" provisions of the federal Sentencing Guidelines apply to the Defendant in this case. But the Court's application of the categorical approach is further complicated here by the question of whether a decades-old precedential panel opinion of our Court of Appeals remains "good law" in the face of a more recent *en banc* decision of that same court that substantially reworked when and how a federal sentencing court is to consider the application notes—or "commentary"—to the Sentencing

---

[1] *See Mathis v. United States*, 579 U.S. 500, 538, 543–44 (2016) (Alito, J. dissenting); *United States v. Montgomery*, 966 F.3d 335, 340 (5th Cir. 2020) (Elrod, J. concurring); *United States v. Evans*, 924 F.3d 21, 31–32 (2d Cir. 2019).

Guidelines. That later *en banc* decision appears to have knocked the proverbial pins out from under the prior panel opinion's reasoning—reasoning which already appeared for other reasons to run counter to a string of Supreme Court and Third Circuit decisions before and after that fall squarely on the same topic.

The defendant in this case, Clarence M. Green, Jr., was sentenced in 2006 to 300 months' imprisonment for drug- and firearm-related offenses. (ECF No. 112.) In July of 2020, this Court determined that a portion of Mr. Green's sentence, specifically that part which related to an Armed Career Criminal Act ("ACCA") enhancement, was unconstitutional in light of *Johnson v. United States*, 576 U.S. 591 (2015), and *United States v. Mayo*, 901 F.3d 218 (3d Cir. 2018). This Court granted Mr. Green's petition under 28 U.S.C. § 2255, vacated his sentence at Count 4, and determined that Mr. Green was entitled to a full resentencing hearing. (ECF Nos. 308–09.)

The Court then ordered an updated Presentence Investigation Report ("PSR") from the Probation Office, which was submitted in September of 2020 (ECF No. 316, "PSR Revisions"). The Government objected to the Probation Office's conclusion in the PSR Revisions that Mr. Green no longer qualified as a "career offender" under United States Sentencing Guidelines ("U.S.S.G.") §§ 4B1.1 and 4B1.2. (ECF No. 320.) The Parties submitted briefing on the matter, and then additional rounds of briefing regarding intervening developments at the Third Circuit and United States Supreme Court—namely, the decisions in *Borden v. United States*, 141 S. Ct. 1817 (2021), and *United States v. Nasir*, 982 F.3d 144 (3d Cir. 2020),[2] as well as developments on the

---

[2] This Court ordered the filing of supplemental memoranda regarding the impact of the first *en banc* decision in *Nasir* on March 9, 2021. (ECF No. 329.) On October 4, 2021, the Supreme Court vacated that first *en banc Nasir* decision and remanded the case back to the Court of Appeals for further consideration in light of *Greer v. United States*, 141 S. Ct. 290 (2021). *See* 142 S. Ct. 56 (2021) (Mem.). This Court did not order additional briefing following the Third Circuit's second *en banc* decision on remand in *Nasir*, which was issued on November 8, 2021, because the decision did not change with respect to the issues here. *See* 17 F.4th 459 (2021).

Third Circuit's docket in *United States v. Harris*, No. 17-1861 (3d Cir. appeal docketed Apr. 18, 2017). (*See* ECF Nos. 318, 320, 322–23, 332–33, 335–37, 341.)

The Court has considered the thorough and reasoned filings of the parties and concludes that Mr. Green remains a "career offender" under the advisory Sentencing Guidelines. The Court's ultimate conclusion is consistent with that reached in a prior Third Circuit precedential panel opinion, *United States v. McQuilkin*, 97 F.3d 723 (3d Cir. 1996), which held that the same Pennsylvania aggravated assault provision at issue in this case, 18 Pa. Cons. Stat. § 2702(a)(1), constitutes a "crime of violence" under U.S.S.G. § 4B1.2. *McQuilkin's* holding is directly on point, and as a precedential opinion of our Court of Appeals, it is presumed to be binding on this Court unless overruled by that Court sitting *en banc* or by the Supreme Court. *See Jakomas v. City of Pittsburgh*, 342 F. Supp. 3d 632, 647 (W.D. Pa. 2018).

But as discussed below, while the holding of *McQuilkin* has never been explicitly overruled (at least not by name) by an *en banc* panel of the Court of Appeals or by the Supreme Court, this Court concludes that its reasoning has been so undermined by subsequent decisions of the Third Circuit, including most critically by its *en banc* decision in *Nasir* and the precedential panel opinion in *United States v. Adair*, No. 20-1463, 2022 WL 2350277 (3d Cir. June 30, 2022), as well as by decisions of the Supreme Court, that it would be improvident to truncate this Court's analysis of the issues presented by the parties and rely on *McQuilkin* alone in deciding this case. Given the gravity of the matters involved and the high if not inevitable likelihood of an appeal by the disappointed party in this case, all coupled with the apparent sea change in the consideration of the application notes to the Sentencing Guidelines that was wrought by the *Nasir* decision as clarified by *Adair*, this Court has conducted anew a "categorical approach" analysis, in line with the methodology as it is currently prescribed by the Supreme Court and by the Third Circuit.

3

Ultimately, this Court reaches the same result under that categorical approach analysis as was reached in *McQuilkin*—that is, that § 2702(a)(1) constitutes a "crime of violence" under U.S.S.G § 4B1.2.

## I.    Factual Background

Following a jury trial in December of 2005, Mr. Green was found guilty of six (6) federal drug and firearms charges. (ECF No. 85.) In February of 2006, the Probation Office submitted a Presentence Investigation Report (PSR) classifying Mr. Green as a career offender under § 4B1.1 of the United States Sentencing Guidelines. Under U.S.S.G. § 4B1.1, a defendant is a career offender subject to a sentencing enhancement if the defendant was at least age eighteen at the time of the offense of conviction; the offense of conviction is a felony that is either a "crime of violence" or "controlled substance offense"; and the defendant has at least two prior felony convictions of either a "crime of violence" or of a qualifying controlled substance offense, both of which are defined in U.S.S.G. § 4B1.2.

Mr. Green's initial designation as a career offender under § 4B1.1 was based on one qualifying controlled substance offense—a 2002 conviction for delivery of cocaine (CC No. 200105010)—and one crime of violence—a 1989 conviction for aggravated assault involving an incident in which Mr. Green shot a victim in the thigh at close range after a verbal altercation (CC No. 198612106). (PSR ¶¶ 31, 32, 36.)[3] The aggravated assault conviction was pursuant to 18 Pa. Cons. Stat. § 2702(a)(1). The PSR determined that these two prior felony convictions met the requirements of § 4B1.1 and concluded that Mr. Green should therefore be classified as a career

---

[3] No ECF docket number is listed because Mr. Green's original PSR is not available on the electronic docket.

offender, elevating his criminal history from category III to category VI. (PSR ¶¶ 23, 35–36.)[4] The PSR also determined that Mr. Green qualified as a statutory "armed career criminal" offender under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), and U.S.S.G. § 4B1.4, based on the same convictions as well as a felony conviction for delivery of cocaine from 1983 (CC No. 198209971). (*Id.* ¶ 23.)[5] The Sentencing Guidelines advised a sentence of 360 months to life, (*see* ECF No. 109, at 4), and the sentencing judge imposed a term of imprisonment of 300 months on June 23, 2006, (ECF No. 110).[6]

Since then, this case has proceeded in a series of fits and starts that have been dictated by the changing legal landscape concerning ACCA and the rules defining career offender status under the Guidelines, along with corresponding needs to stay proceedings. Those changes to the legal landscape and the corresponding stays are outlined in detail in this Court's prior Opinion of July 2020, granting Mr. Green's Motion to Correct Sentence Under 28 U.S.C. § 2255 ("Motion to Vacate") and ordering resentencing. (*See* ECF No. 308, at 3–5.) For the purposes of the instant dispute, the Court will summarize the key legal developments involved here, beginning with some foundational terminology.

---

[4] The PSR prepared by the Probation Office in February of 2006 determined that Mr. Green's total offense level was 37. (*Id.* ¶ 26.) However, Mr. Green objected to the Probation Office's calculation of his total offense level on the grounds that he did not receive notice of the Government's intent to enhance his drug convictions as is required under 21 U.S.C. § 851, and as a result, that his total offense level should have been 34 rather than 37. (ECF No. 104, at 2–7.) The sentencing judge sustained Mr. Green's objection, resulting in an advisory Sentencing Guidelines range of 360 months to life. (ECF No. 109, at 4.)

[5] This 1983 conviction did not qualify as a predicate offense under § 4B1.1's career offender designation rule because the sentence (of two years of probation) was imposed more than 10 years before the commencement of the offense conduct that Mr. Green was convicted of in 2005. U.S.S.G. §§ 4A1.2(e)(2); 4B1.2 cmt. n.3 (2005).

[6] Mr. Green currently has a projected release date of December 7, 2027. *Bureau of Prisons Inmate Locator*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last accessed July 8, 2022).

At the time Mr. Green was sentenced in 2006, there were, broadly defined, three avenues to classify a given crime as a "violent felony" (under ACCA) or "crime of violence" (under the career offender Guidelines) such that it would qualify as a predicate offense under those respective provisions. *See* 18 U.S.C. § 924(e)(2)(B) (2000); U.S.S.G. § 4B1.2(a) (2005).[7] The first avenue is commonly called the "use of force" or "elements" clause; it includes felony offenses having "as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i) (2000); U.S.S.G. § 4B1.2(a)(1) (2005). The second is the "enumerated offense" clause, which lists certain specific crimes, such as arson, which if committed in their "generic form" constitute predicate violent offenses. 18 U.S.C. § 924(e)(2)(B)(ii) (2000); U.S.S.G. § 4B1.2(a)(2) (2005). The third is the "residual" clause, which covers other crimes "involv[ing] conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii) (2000); U.S.S.G. § 4B1.2(a)(2) (2005). The contours of both the elements and residual clauses have shifted considerably since Mr. Green's original sentencing.

To begin with, in 2015, the Supreme Court ruled in *Johnson v. United States* that the residual clause of ACCA is unconstitutionally vague. 576 U.S. 591 (2015). Mr. Green filed his Motion to Vacate (ECF No. 247) in June of 2016, arguing that *Johnson* called into question both his designation as an "armed career criminal" under ACCA and U.S.S.G. § 4B1.4, as well as his status as a "career offender" under U.S.S.G. § 4B1.1, which at that time referenced an identical "residual" provision in U.S.S.G. § 4B1.2. In March of 2017, the Supreme Court held in *Beckles v. United States* that the residual provision in § 4B1.2 was *not* void for vagueness, 137 S. Ct. 886 (2017), after which Mr. Green stopped pressing that argument with respect to the career offender

---

[7] The 2006 Federal Sentencing Guidelines Manual did not take effect until Nov. 1, 2006.

Guidelines in his Motion to Vacate, (*see* ECF No. 263, at 2). However, after Mr. Green filed his

Motion to Vacate, the United States Sentencing Commission revised the career offender

Guidelines in November of 2016 to replace the then-existing enumerated offense and residual

clauses in § 4B1.2 with a single, more-extensive enumerated offense clause; the resulting career

offender Guidelines no longer contain a residual clause. Thus, for the purposes of Mr. Green's

Motion to Vacate, the residual clause was off the table for ACCA, and for the purposes of Mr.

Green's current resentencing, it is also off the table for the Guidelines' career offender provision.[8]

---

[8] Mr. Green concedes that the 2018 version of the United States Sentencing Guidelines applies to this case. (ECF No. 306, at 2.) 28 U.S.C. § 2255 permits the Court to resentence a defendant "as may appear appropriate." And 18 U.S.C. § 3553(a)(4)(A)(ii) generally requires the Court to apply the Guidelines in effect on the date of a defendant's sentencing—except as provided in 18 U.S.C. § 3742(g), which does not apply to resentencing occurring because of a § 2255 grant. The Court therefore concludes that it is "appropriate" under § 2255 to apply the version of the Guidelines that is in effect today. And due to a lack of a quorum in the membership of the United States Sentencing Commission, the 2018 version of the Sentencing Guidelines Manual remains in force.

Section 4B1.2(a)(2) of the 2018 Guidelines includes "aggravated assault" as a crime of violence under the expanded enumerated offense clause (the version added in 2016):

(a) The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—

(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2) is murder, voluntary manslaughter, kidnapping, *aggravated assault*, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c).

U.S.S.G. § 4B1.2(a) (2018) (emphasis added).

The 2005 Sentencing Guidelines, which applied when Mr. Green was originally sentenced, contained a shorter enumerated offense clause (in which aggravated assault did not appear), along with the residual clause:

(a) The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that --

(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(a) (2005). In the 2005 version, however, aggravated assault did appear in Application Note 1:

1. For purposes of this guideline—

The elements clause has also been the subject of extensive litigation. Most notably, in *Borden v. United States*, the Supreme Court determined that a criminal offense that requires a *mens rea* of mere recklessness cannot quality as a "violent felony" under the elements clause of ACCA. 141 S. Ct. 1817. *Borden* specifically reserved the question of whether statutes permitting conviction based on a mental state of "extreme recklessness," as is true of 18 Pa. Cons. Stat. § 2702(a)(1), are covered by the elements clause. *Id.* at 1825 n.4. But separately, in 2018, the Third Circuit held in *United States v. Mayo* that § 2702(a)(1) does not qualify as a "violent felony" under ACCA's elements clause because it permits a conviction for conduct that does not involve physical force but nevertheless causes serious bodily injury, such as the deliberate failure to provide food or medical care. 901 F.3d 218 (3d Cir. 2018).[9]

---

. . .

"Crime of violence" includes murder, manslaughter, kidnapping, *aggravated assault*, forcible sex offenses, robbery, arson, extortion, extortionate extension of credit, and burglary of a dwelling. Other offenses are included as "crimes of violence" if (A) that offense has as an element the use, attempted use, or threatened use of physical force against the person of another, or (B) the conduct set forth (i.e., expressly charged) in the count of which the defendant was convicted involved use of explosives (including any explosive material or destructive device) or, by its nature, presented a serious potential risk of physical injury to another.

*Id.* at cmt. n.1 (emphasis added).

[9] The Third Circuit currently has before it *United States v. Harris*, No. 17-1861, which may ultimately lead to a revisiting of the Third Circuit's holding in *Mayo*. *Harris* was first docketed with the Third Circuit more than five years ago, on April 18, 2017. Oral argument before the merits panel took place on January 16, 2018. On June 7, 2018, before the merits panel issued its decision, the Third Circuit *sua sponte* ordered rehearing *en banc*. After some delay, oral argument before the *en banc* court eventually took place on October 16, 2019, but the *en banc* court's decision was stayed pending the decision of the Supreme Court in *United States v. Borden*.

The Supreme Court issued its *Borden* opinion on June 10, 2021. Then, on September 17, 2021, without issuing any decision on the merits, the Third Circuit issued another *en banc* order, vacating its prior order which had granted rehearing *en banc*, and sending *Harris* back to the merits panel for disposition. Mr. Harris was granted bail pending appeal in October of 2021. On January 4, 2022, the merits panel certified the following question of law to the Supreme Court of Pennsylvania: "Whether the Pennsylvania First-Degree Aggravated Assault provision, codified at 18 Pa. Cons. Stat. Section: 2702(a)(1), requires some use of physical force, as the Government contends, or, instead, as the Pennsylvania Superior Court said in *Commonwealth v. Thomas*, 867 A.2d 594, 597 (Pa. Super. Ct. 2005), the statute means that "the use of force or threat of force is not an element of the crime." The Pennsylvania Supreme Court granted the Circuit's petition for certification on February 14, 2022. (Case No. 1 EM 2022.) Mr. Harris filed his brief in the Pennsylvania Supreme Court on April 26, 2022, the Government filed its response on May 26, 2022, and Mr. Harris's filed his reply on July 1, 2022. (Case No. 5 EAP 2022.) Oral argument before the Pennsylvania Supreme

This Court granted Mr. Green's Motion to Vacate in July of 2020, determining that his aggravated assault conviction under § 2702(a)(1) was not an ACCA predicate offense under 18 U.S.C. § 924(e). (ECF Nos. 308–09.) The Court concluded that the § 2702(a)(1) conviction could not qualify under ACCA's residual clause, which had been ruled unconstitutional in *Johnson*; that it could not qualify under the elements clause following *Mayo*; and that it could not qualify under ACCA's enumerated offense clause because aggravated assault is not one of those offenses so enumerated in § 924(e)(2)(B)(ii). (*See* ECF No. 308, at 8–9.) The Court further concluded that it could not "be certain that the sentencing court would have arrived at the same overall sentence" had Mr. Green not been subject to the ACCA-enhanced 15-year mandatory minimum at Count 4 and ordered resentencing under the "sentencing package" doctrine. (*Id.* at 11.)

The question now before the Court is whether Mr. Green should be so resentenced as a career offender under § 4B1.1 of the advisory Sentencing Guidelines. The PSR Revisions submitted by the Probation Office in September 2020 take the position that he should not be classified as a career offender. (ECF No. 316 ¶¶ 3–7.) The Government disagrees and has objected to the PSR Revisions. (ECF Nos. 320, 323.) Under the controlling mode of analysis (the "categorical approach"), the question of whether Mr. Green is a career offender depends on

---

Court has been set for September 13, 2022. (*Id.*) As such, it is likely to be a matter of months (at minimum) before any potential impact of *Harris* on *Mayo* is realized.

This Court concludes that it is appropriate to issue its decision in this matter even though *Harris* remains pending, and it will do so now. *See Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am., AFL-CIO*, 544 F.2d 1207, 1215 (3d Cir. 1976). The resentencing in this case is the result of a 28 U.S.C. § 2255 petition that Mr. Green filed in June of 2016. His case has already been stayed multiple times, (*see* ECF No. 308, at 3–5), and there is no guarantee that the decision of the Pennsylvania Supreme Court will arrive quickly. And even if that decision does arrive quickly, it is unlikely to have any impact on the outcome of the particular dispute now before this Court, because while *Harris* is focused on the elements clause, this Court concludes that Mr. Green's aggravated assault conviction qualifies as a predicate offense under the enumerated offense clause of U.S.S.G. § 4B1.2. This Court ruled that Mr. Green was entitled to resentencing in July of 2020. (ECF Nos. 308–09.) The issues presented by the question of his career offender status are complex and substantial. But this Court has resolved those issues and concludes that it is appropriate to proceed in this case.

whether Pennsylvania's aggravated assault provision, and specifically 18 Pa. Cons. Stat. § 2702(a)(1), is broader than the "generic" version of "aggravated assault" that is included in § 4B1.2's enumerated offense clause. The answer has significant implications for Mr. Green's sentencing exposure. According to the PSR Revisions, if Mr. Green is not classified as a career offender, his total offense level is 20 and his criminal history category is III. (ECF No. 316 ¶ 13.) That translates to a guideline sentence of 41 to 51 months at Counts 1, 2, 4, 5, and 6, followed by a mandatory minimum consecutive term of 60 months at Count 3. (*Id.* ¶¶ 12–13.) If Mr. Green is classified as a career offender, he faces total sentencing exposure of 360 months to life. (ECF No. 320, at 15; U.S.S.G. § 4B1.1(c)(3).)

## II.   <u>Legal Standard</u>

Under U.S.S.G. § 4B1.1, a defendant qualifies as a "career offender" subject to sentencing enhancement where the offense of conviction is a felony that is either a crime of violence or a controlled substance offense, the defendant was at least eighteen years old when he committed the offense of conviction, and the defendant has "at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). Section 4B1.2(a) of the 2018 version of the Guidelines defines the term "crime of violence" as any offense punishable by over one year of imprisonment that either (1) "has as an element the use, attempted use, or threatened use of physical force against the person of another," or (2) is one of several enumerated offenses, including "aggravated assault." U.S.S.G. § 4B1.2(a) (2018). The focus of the Court's inquiry is on the second provision—the enumerated offense clause.[10]

---

[10] The parties contest whether Mr. Green's conviction under § 2702(a)(1) is a "crime of violence" under both the "elements" and "enumerated offense" clauses. However, the Court concludes that Pennsylvania's aggravated assault statute does not qualify as a crime of violence under the Sentencing Guidelines' elements clause. U.S.S.G. § 4B1.2(a)(1). In *Mayo*, the Third Circuit held that first-degree aggravated assault under 18 Pa. Cons. Stat.

Under the "categorical approach" outlined by the Supreme Court in *Taylor v. United States*, the Court must determine whether "aggravated assault" under 18 Pa. Cons. Stat. § 2702(a)(1) is broader than the "generic" version of aggravated assault that is listed in the enumerated offense clause of § 4B1.2(a)(2). *See* 495 U.S. 575 (1990). That is because the *Taylor* Court explained that it is "implausible that Congress intended the meaning of [a particular enumerated offense] . . . to depend on the definition adopted by the State of conviction." *Id.* at 590. Instead, when Congress or the Sentencing Commission refers to a generic offense, the term "must have some uniform definition independent of the labels employed by the various States' criminal codes" to avoid disparities between similar defendants. *Id.* at 591–92.

The Third Circuit has articulated a three-step approach to the analysis required by *Taylor*. Courts must "first identify the elements of the state offense, then identify the elements of the generic offense, and finally determine whether the former are the same as or narrower than the latter." *United States v. Graves*, 877 F.3d 494, 501 (3d. Cir. 2017). If the elements of the generic offense are narrower than the state statute, the state statute is overbroad and does not constitute a crime of violence for the purpose of the Sentencing Guidelines. *Id.* The generic form of a given offense is determined by reference to the definitions employed "by the States, learned treatises, and the Model Penal Code." *United States v. Marrero*, 743 F.3d 389, 399 (3d Cir. 2014) (quoting *United States v. Lockley*, 632 F.3d 1238, 1242 (11th Cir. 2011)).

---

§ 2702(a)(1) failed to qualify as a "crime of violence" under the identical "elements" clause included in the Armed Career Criminal Act. 901 F.3d 218 (3d Cir. 2018). As the Government concedes, this reasoning applies equally to the Guidelines' identically worded elements clause in § 4B1.2(a)(1). (ECF No. 320, at 14 (preserving for further review the argument that Mr. Green's aggravated assault conviction satisfies the Guidelines' elements clause).) The Court thus concludes that § 2702(a)(1) does not qualify as a crime of violence under U.S.S.G. § 4B1.2(a)'s elements clause, leaving only the inquiry as to the enumerated offense clause.

11

In certain cases, where the statute in question is "divisible," the "modified categorical approach" applies, and the Court performs the required comparison not to the statute as a whole, but to the specific set of elements under which the defendant was convicted. *United States v. Ramos*, 892 F.3d 599, 606–07 (3d Cir. 2018). The parties agree that the modified categorical approach should apply here, and further agree that Mr. Green's conviction rests on § 2702(a)(1),[11] which provides that a person is guilty of aggravated assault if he or she:

> attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life.

18 Pa. Cons. Stat. § 2702(a)(1); *see* Act No. 1980-167, 1980 Pa. Laws 978, § 2 (enacted October 16, 1980) (identical text as of 1986). The remaining question for the Court is whether § 2702(a)(1) is "broader" than generic aggravated assault because it permits a conviction with a *mens rea* of recklessness under circumstances manifesting extreme indifference to the value of human life ("extreme indifference recklessness").

### III.   **Discussion**

---

[11] "A divisible statute sets out one or more elements in the alternative, most often using disjunctive language to list multiple, alternative criminal offenses." *Id.* at 608 (3d Cir. 2018) (emphasis omitted). In *Ramos*, the Third Circuit determined that 18 Pa. Cons. Stat. § 2702 is divisible, both because it recognizes first and second-degree aggravated assault and because it specifies alternative offenses within each degree of aggravated assault. *Id.* at 609. Even where a statute is divisible, the Court may not apply the modified categorical approach unless certain "Shepard documents" (which include the indictment and plea agreement) "establish the offense of conviction with 'certainty.'" *Id.* at 610 (quoting *United States v. Henderson*, 841 F.3d 623, 631 (3d Cir. 2016)).

The parties agreed for the purpose of Mr. Green's § 2255 motion that his aggravated assault conviction was pursuant to § 2702(a)(1)—rather than some other subsection of § 2702—and the *Shepard* documents from the 1989 case confirm that designation. (*See* ECF No. 268-2, at 3 (charging information states that Green "attempted to cause or intentionally, knowingly, or recklessly caused serious bodily injury to Fred Marshall, under circumstances manifesting extreme indifference to the value of human life, that is to say the actor shot victim in his left thigh requiring him to be hospitalized for his injuries," in violation of "18 Pa. C.S. § 2702(a)(1)").)

12

The parties agree that Supreme Court and Third Circuit precedents generally require a Court to apply the categorical approach in a case like Mr. Green's. (*See* ECF Nos. 322, at 2; 323, at 3.) But the Government argues that this Court need not conduct its own categorical analysis here and now, because it argues that the Third Circuit has already held in a precedential opinion that 18 Pa. Cons. Stat. § 2702(a)(1) "is generic aggravated assault under the Guidelines." (ECF No. 320, at 4 (citing *United States v. McQuilkin*, 97 F.3d 723 (3d Cir. 1996)).) Mr. Green disagrees and instead maintains that *McQuilkin's* holding with respect to Pennsylvania's aggravated assault statute is neither binding nor persuasive. (ECF No. 322, at 2.) He argues that the *McQuilkin* Court erred at the time it issued its decision by failing to apply *Taylor's* categorical analysis despite the fact that *Taylor* was decided by the Supreme Court six years prior to *McQuilkin*. (*Id.* at 3–4.) Mr. Green further argues that even if *McQuilkin* can be reconciled with Third Circuit and Supreme Court precedent as of the time it was decided, subsequent cases from both the Supreme Court and our Court of Appeals have effectively overruled *McQuilkin* such that its holding in such regards no longer binds this Court. (*Id.* at 4–6.)

In addition to disagreeing about the continued applicability of *McQuilkin*, the parties disagree about what the outcome of the categorical analysis should be if this Court finds that it is not bound by *McQuilkin*. The Government argues that "generic" aggravated assault includes offenses committed with a *mens rea* of extreme-indifference recklessness and, accordingly, that § 2702(a)(1) is commensurate with generic aggravated assault. (ECF No. 320, at 8–14.) Mr. Green takes the opposite position—arguing that § 2702(a)(1)'s inclusion of an extreme-indifference recklessness *mens rea* makes it broader than generic aggravated assault and thus that a conviction under § 2702(a)(1) does not categorically qualify as a "crime of violence" under U.S.S.G. § 4B1.2. (ECF No. 322, at 6–14.)

13

This Court ultimately concludes that subsequent cases, including, most significantly, the Third Circuit's *en banc* decision in *United States v. Nasir*, 17 F.4th 459 (3d Cir. 2021), and that Court's panel decision in *United States v. Adair*, No. 20-1463, 2022 WL 2350277 (3d Cir. June 30, 2022), have so eroded the precedential value of *McQuilkin* that it would be improvident for this Court to rely on *McQuilkin* to conclusively resolve the issue of Mr. Green's career offender status, thereby truncating its analysis of the issues presented by the parties. As a result, the Court has also conducted a categorical analysis, following the analytical steps that are now explicitly required under the Third Circuit's caselaw involving the career offender Guidelines—that is, the categorical approach set out by the Supreme Court in *Taylor* and adopted by the Third Circuit in the context of § 4B1.2 in *Marrero* and *Graves*. Based on that *Taylor* analysis, the outcome of which turns out to be substantively consistent with that dictated by the holding in *McQuilkin*, this Court concludes that Mr. Green should be classified as a career offender under U.S.S.G. § 4B1.1, and he will be resentenced accordingly.

**A.** ***McQuilkin's* precedential value has been so cast into doubt by the Third Circuit's *en banc* decision in *Nasir*, particularly as interpreted by the recent panel decision in *Adair*, that the Court will not rely on *McQuilkin* to resolve this case.**

The Government argues that this Court does not need to conduct a fresh categorical analysis because the Third Circuit already decided in *McQuilkin* that § 2702(a)(1) constitutes generic aggravated assault under the Sentencing Guidelines and thus that it is a crime of violence under U.S.S.G. § 4B1.2. (ECF No. 320, at 4–5 (citing 97 F.3d 723 (3d Cir. 1996)).) Mr. Green argues in response that *McQuilkin* was wrong at the time it was decided because it did not apply the categorical analysis prescribed by *Taylor* and further argues that beyond that, this Court is not

14

bound by *McQuilkin* now because its relevant holding has been impliedly overruled by subsequent decisions of the Third Circuit. (ECF No. 322, at 2–6.)

This Court recognizes that *McQuilkin's* bottom-line holding is on point and that it would be presumptively binding on this Court because it is a precedential opinion that has never been overturned by name by an *en banc* decision of our Court of Appeals or by the Supreme Court. But, for the reasons set out below, the Court concludes that the precedential value of *McQuilkin* has been so diminished by intervening developments in the controlling law of the Third Circuit, particularly as announced in the *en banc* decision in *Nasir* and as applied in the panel decision in *Adair*, that it would be perilous, if not wholly improvident, to now rely only on *McQuilkin* in resolving an issue as consequential as Mr. Green's career offender status.

     i.     *McQuilkin's* central reasoning does not survive *Nasir* and *Adair* and its failure to conduct a categorical analysis is in direct conflict with current Third Circuit caselaw.

Robert McQuilkin was convicted in 1988 of aggravated assault under 18 Pa. Cons. Stat. § 2702(a)(1)—the same statutory provision at issue here—based on an incident in which he crashed his motorcycle while under the influence of drugs and alcohol, severely injuring himself and his passenger. *McQuilkin*, 97 F.3d at 726. When this aggravated assault conviction was later used to enhance a federal sentence under the career offender provisions of the Sentencing Guidelines, Mr. McQuilkin argued that his § 2702(a)(1) conviction was improperly treated as a predicate crime of violence under U.S.S.G. §§ 4B1.1 and 4B1.2 because it was committed with a *mens rea* of (only) extreme-indifference recklessness. *See id.* Mr. McQuilkin urged the Third Circuit to consider the specific conduct of which he was convicted—including the involved *mens*

*rea*—and argued that his was not the sort of violent conduct contemplated by Congress or the Sentencing Commission in crafting the career offender provisions. *Id.* at 726–27.

At the time *McQuilkin* was decided, the career offender provisions did not include "aggravated assault" as an enumerated offense in the Guideline's text, but instead listed aggravated assault as a qualifying offense in an application note. U.S.S.G. § 4B1.2 cmt. n.2 (1995). The *McQuilkin* court, however, appears not to have differentiated between crimes enumerated in the application notes (or "commentary") and those enumerated in the text of the Guidelines, instead referring repeatedly to "specifically enumerated" crimes without such distinction. *See* 97 F.3d at 727–28, 728 n.9. Elsewhere in the *McQuilkin* opinion, the Third Circuit explained that "[c]ommentary in the guidelines is binding unless it runs afoul of the Constitution or a federal statute, or is plainly erroneous or inconsistent with the section of the guidelines it purports to interpret." *Id.* at 731 (citing *Stinson v. United States*, 508 U.S. 36, 42–45 (1993)).

This highly deferential treatment of the commentary was consistent with that taken by the Third Circuit in other cases involving enumerated offenses in the application notes for many years. *See, e.g.*, *Marrero*, 743 F.3d 389 (3d. Cir. 2014) (murder); *United States v. McAllister*, 927 F.2d 136 (3d Cir. 1991) (robbery), *United States v. Butler*, 208 F. App'x 167, 170 (3d Cir. 2006) (manslaughter); *cf. United States v. Hightower*, 25 F.3d 182 (3d Cir. 1994) (deferring to commentary on question of whether "controlled substance offense" covered inchoate crimes). As discussed below, however, this level of deference to the Guidelines' commentary is plainly no

longer permitted following the Third Circuit's *en banc* decision in *United States v. Nasir*, 17 F.4th 459 (3d Cir. 2021), which overruled *Hightower*.[12]

Having determined that aggravated assault was a "specifically enumerated" crime of violence, the Third Circuit in *McQuilkin* concluded that it was not "permit[ed] to examine the actual conduct underlying" Mr. McQuilkin's § 2702(a)(1) conviction. 97 F.3d at 727. Instead, the *McQuilkin* court explained that the "fact of conviction" of a crime specifically enumerated in the application notes is "dispositive" of whether such conviction constitutes a crime of violence. *Id.* at 728. And notably, the *McQuilkin* court made no apparent inquiry as to whether § 2702(a)(1) corresponds to the generic form of aggravated assault that was then-enumerated in the application notes.

In this Court's estimation, there are thus two aspects of the *McQuilkin* decision which counsel great caution in considering these matters from today's perspective. The first concerns the *McQuilkin* court's deferential treatment of the application notes to U.S.S.G. § 4B1.2, which on its own casts *McQuilkin's* precedential value into substantial doubt given the interpretation and application of *Nasir* that was recently outlined and explained by a panel of the Third Circuit in *Adair*. The second concerns the fact that the *McQuilkin* opinion makes no reference to any effort to define a generic version of "aggravated assault" with which to compare § 2702(a)(1), as is explicitly required by the "categorical approach" set out in *Taylor v. United States*, 495 U.S. 575 (1990)—an approach that arguably should have been applied when *McQuilkin* was decided and

---

[12] The recent panel decision in *Adair* outlines in detail the change in approach to the Sentencing Commission's interpretive commentary that was wrought by the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), and the Third Circuit's *en banc* decision in *Nasir*. *See* No. 20-1463, 2022 WL 2350277, at *3 (3d Cir. June 30, 2022).

17

that under current Third Circuit caselaw now unquestionably applies in the context of the career offender provisions of the Sentencing Guidelines.

> 1. *McQuilkin's* deference to the Guidelines' commentary appears to be directly in
> conflict with *Nasir* as *Adair* directed that *Nasir* be applied.

The Third Circuit in *Nasir* held in an *en banc* opinion that the Supreme Court's decision in *Kisor v. Wilkie*, which "cut back on what had been understood to be uncritical and broad deference to agency interpretations of regulations," applied to the interpretive commentary accompanying the Sentencing Guidelines. *United States v. Nasir*, 17 F.4th 459, 471 (3d Cir. 2021) (citing 139 S. Ct. 2400 (2019)).

Under *Kisor*, so-called "*Auer* deference" to an agency's interpretation of its own regulation applies only once a court has determined that a regulation is "genuinely ambiguous" by exhausting all of the "traditional tools of construction." *Id.* (quoting 139 S. Ct. at 2414–15). The *Nasir* court also noted that—following *Kisor*—*Auer* deference is limited even where a regulation is genuinely ambiguous. *Id.* In order for *Auer* deference to apply to an agency's interpretation of an ambiguous regulation, the agency's reading must be "reasonable[,]" as informed by "[t]he text, structure, history, and so forth." *Id.* (quoting *Kisor*, 139 S. Ct. at 2415–16). A court must also independently consider whether an agency's interpretation is entitled to controlling weight based on its character, context, and whether it implicates the agency's substantive expertise; and the agency's reading must "reflect fair and considered judgment" and not be simply a "convenient litigating position." *Id.* (quoting *Kisor*, 139 S. Ct. at 2416–17).

On its face, *Nasir* only overruled *Hightower* (at least by name), but there were strong indications in the decision, particularly in the concurring opinion written by Judge Bibas,[13] that *Nasir* would necessarily have broader implications for federal sentencing. And to that point, just one week ago, a panel of the Third Circuit made those indications explicit in its decision in *United States v. Adair*. No. 20-1463, 2022 WL 2350277 (3d Cir. June 30, 2022).

*Adair* first stated that the *en banc* Court of Appeals in *Nasir* had "unanimously concluded that the reprised standard for *Auer* deference applied to the [Sentencing] Commission's interpretive commentary," and then went further to explain the reach of the *Nasir* decision, holding that, after *Nasir*, "prior caselaw that had afforded *Auer* deference to the Commission's interpretive commentary without engaging in the *Kisor* process does not automatically retain its controlling force." *Id.* at *3 (citing *Nasir*, 17 F.4th at 470–71). The *Adair* court explained that "to remain binding, such a decision must have (presciently) complied with the *Kisor* process: a genuine-ambiguity analysis followed by an independent evaluation of the character and context of the agency's interpretation, provided that the agency's interpretation falls within the Guideline's zone of ambiguity." *Id.* (citing *Nasir*, 17 F.4th at 471–72).

The *McQuilkin* court's treatment of an enumerated offense listed in the application notes as being interchangeable with one listed in the text of the Guidelines does not display that level of prescience. Moreover, had the *McQuilkin* court followed the process set out in *Kisor* and *Nasir*,

---

[13] Judge Bibas's concurring opinion in *Nasir* was joined by Judges Ambro; Jordan (who also authored the lead opinion of the *en banc* Court); Greenaway, Jr.; Krause; and Restrepo. In that concurring opinion, Judge Bibas observed that, for decades, every federal court of appeals, including the Third Circuit, gave "nearly dispositive weight" to the Guidelines' commentary rather than the plain text of the Guidelines, but that "the winds have changed" as a result of *Kisor*, and the Court of Appeals must "look at things afresh." *Nasir*, 17 F. 4th at 472 (Bibas, J., concurring).

this Court concludes that it is highly doubtful that the *McQuilkin* decision would have (or even could have) come out the way it did as to this issue. Here's why.

The first question a sentencing court must ask under *Nasir* is whether the Guideline provision at issue is "genuinely ambiguous" after exhausting all the traditional tools of construction. *Nasir*, 17 F.4th at 471. Beginning with the plain language of the definition of "crime of violence" that was present in U.S.S.G. § 4B1.2 at the time *McQuilkin* was decided,[14] it is not immediately apparent which term or terms would be a relevant source of ambiguity.[15] While the additional offenses then-listed in the application note (including, *e.g.*, "murder")[16] might well *qualify* as crimes of violence under the definition provided in the Guideline text (such as through the elements clause), their inclusion in the commentary does not appear to be geared at addressing

---

[14] In October of 1996, the text of U.S.S.G. § 4B1.2 read, in relevant part:

(1) The term "crime of violence" means any offense under federal or state law punishable by imprisonment for a term exceeding one year that —

   (i) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

   (ii) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(1) (1995).

[15] This Court takes no position on whether some term or terms could be found to be ambiguous in a future case. The Court merely notes that the application note in question does not purport to identify or define the terms used in the definition of "crime of violence" that is provided in the text of § 4B1.2. Rather than defining or clarifying the *terms used* in the definition of "crime of violence" (*e.g.*, "force" or "attempt"), the commentary instead appears to provide a *different definition* of the term "crime of violence" itself. *See* U.S.S.G. § 4B1.2 cmt. n.2 (1995).

[16] Application Note 2 then contained the following language:

"'Crime of violence' includes *murder, manslaughter, kidnapping, aggravated assault, forcible sex offenses, robbery, arson, extortion, extortionate extension of credit, and burglary of a dwelling*. Other offenses are included where (A) that offense has as an element the use, attempted use, or threatened use of physical force against the person of another, or (B) the conduct set forth (i.e., expressly charged) in the count of which the defendant was convicted involved use of explosives (including any explosive material or destructive device) or, by its nature, presented a serious potential risk of physical injury to another. Under this section, the conduct of which the defendant was convicted is the focus of inquiry."

U.S.S.G. § 4B1.2 cmt. n.2 (1995) (emphasis added).

20

any "ambiguity" in the text of the Guideline itself. Instead, in this Court's estimation, the application note appears to simply represent an effort by the Sentencing Commission to add additional enumerated offenses to the Guideline through the interpretive commentary. But that is exactly what *Nasir* prohibits.

*Nasir* involved an application note related to the definition of a "controlled substance offense." The relevant Guideline provision in the text of § 4B1.2(b) defines a "controlled substance offense" as:

> [A]n offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

*Nasir*, 17 F.4th at 469 (quoting U.S.S.G. § 4B1.2(b)). The application notes, however, specify that controlled substance offenses "include the offenses of aiding and abetting, conspiring, and attempting to commit such offenses." *Id.* (quoting U.S.S.G. § 4B1.2 cmt. n.1.) The question before the Third Circuit in *Nasir* was whether the Defendant's conviction for "attempting to possess with intent to distribute cocaine" qualified as a controlled substance offense through reference to this interpretive commentary. *Id.*

The Third Circuit explained that "the guideline does not even mention inchoate offenses," which "alone indicates that it does not include them." *Id.* at 471. The Court of Appeals further determined that its conclusion was "bolstered by the fact that section 4B1.2(b) affirmatively lists many other offenses that do qualify as controlled substance offenses," citing the cannon of construction which holds that "the expression of one thing is the exclusion of the other." *Id.* at 471–72. As a result, the *en banc* court held that Mr. Nasir's attempt conviction was not a controlled

21

substance offense. *Id.* at 472. Then in *United States v. Abreu*, the Third Circuit extended this holding to the definition of "crime of violence" in § 4B1.2(a), holding that the absence of "conspiracy" offenses in the Guideline text meant that the Sentencing Commission could not add them through the application notes. 32 F.4th at 278.

For the same reasons, this Court concludes that the *McQuilkin* Court's inclusion of "aggravated assault" as an additional "enumerated offense" only by reference to the application notes does not constitute a "'reasonable construction' of 'crime of violence' as used in" § 4B1.2(a). *Id.* (quoting *Kisor*, 139 S. Ct. at 2415). The version of § 4B1.2 in place at the time *McQuilkin* was decided included only three (3) enumerated offenses in the Guideline text: burglary of a dwelling, arson, and extortion. U.S.S.G. § 4B1.2(1)(ii) (1995); *see also supra* n.14. The Sentencing Commission "knew how to include [enumerated] offenses in the Guidelines" when it wanted to do so, *Abreu*, 32 F.4th at 276, and yet it included only those three crimes. Thus, while the Commission could have amended § 4B1.2(a) to include "aggravated assault" as an enumerated offense in the Guideline text—and in fact did so in 2016—the Court concludes that under *Nasir*, it could not accomplish that same result through reference to the interpretive commentary.

Accordingly, the *McQuilkin* court's holding that aggravated assault is a crime of violence because (and seemingly only because) it is enumerated in the application notes to § 4B1.2 appears to be directly called into question by *Nasir* as it was applied in *Adair*. *Adair* makes explicit what had been (strongly) implied in *Nasir*: that "[w]ithout th[e] now-essential [*Kisor*] analysis, the binding nature of [prior decisions deferring to the Sentencing Commission's interpretive commentary] no longer perseveres." 2022 WL 2350277, at *4; *see also Nasir*, 17 F.4th at 472 (Bibas, J., concurring) (explaining that "the narrow scope of today's holding hints at a broader problem" with prior cases involving the Sentencing Guidelines, and that "[o]ld precedents that

22

turned to the commentary rather than the text no longer hold"). *McQuilkin* did not engage in that now-required analysis, and this Court concludes post-*Adair* that it could not have reached the same outcome for the same reasons if it had.[17, 18]

> 2. *McQuilkin* also did not conduct a full *Taylor* analysis, as is required under at
> least the Third Circuit's current approach.

The second issue with the *McQuilkin* decision is the reality that there is no evidence in the opinion that the court endeavored to define a "generic" version of "aggravated assault" with which to compare § 2702(a)(1). Instead, the *McQuilkin* court held that the inclusion of a crime labeled "aggravated assault" in the Guidelines' commentary "dispositive[ly]" established that a conviction under § 2702(a)(1) constitutes a crime of violence under § 4B1.2 of the Sentencing Guidelines. *Id.* at 728. While the *McQuilkin* court explained that "the Sentencing Commission has adopted a categorical approach to the determination of whether an underlying offense is a 'crime of violence,'" *id.*, the opinion does not cite to *Taylor*, which had been decided by the Supreme Court

---

[17] It is of course possible that the *McQuilkin* court might have concluded that § 2702(a)(1) was a qualifying crime of violence even absent any reliance on the interpretive commentary, through reference to § 4B1.2's elements clause or (then-present) residual clause. However, this Court would note that as § 4B1.2 no longer contains a residual clause, and as the Court has already determined (based on the Third Circuit's decision in *Mayo*) that § 2702(a)(1) does not qualify as a crime of violence under the elements clause, *see supra* n.10, such a hypothetical "alternate route" to *McQuilkin's* ultimate holding would appear to have problems of its own from today's perspective.

[18] The Court notes that the 2018 Guidelines, which the parties agree apply to Mr. Green's resentencing, do include "aggravated assault" in the text of § 4B1.2(a) as an enumerated offense. See U.S.S.G. § 4B1.2(a)(2) (2018). But as just discussed, the Court's application of *Nasir* to the facts of *McQuilkin* suggests that had the *McQuilkin* court conducted a *Nasir* analysis, it likely could not have concluded that "aggravated assault" was a "specifically enumerated" crime. See 97 F.3d at 728 n.9. As such, the *McQuilkin* court likely would never have reached the second step in its analysis, where it held that the inclusion of aggravated assault as a "specifically enumerated crime" was "dispositive" of the issue of whether § 2702(a)(1) is a crime of violence under § 4B1.2. See id. at 728. Thus, in this Court's view, the issues involving the first analytical step in the *McQuilkin* decision—relating to its highly deferential treatment of the commentary—directly and significantly undercut the vitality of *McQuilkin's* ultimate holding that § 2702(a)(1) is a crime of violence. But as discussed below, even if this Court were to put those concerns aside because "aggravated assault" is now enumerated in the Guideline text, this Court also has considerable doubts about the continuing vitality of *McQuilkin's* second analytical step, in which it held that such enumeration (in the commentary) was dispositive without conducting a full *Taylor* analysis.

six years earlier. And crucially, the *McQuilkin* court did not take the step of defining a generic version of aggravated assault with which to compare § 2702(a)(1), as is explicitly required by the *Taylor* methodology.

The Government argues, however, that "*McQuilkin* did apply *Taylor*," pointing to the fact that *McQuilkin* cited to *United States v. McClenton*, 53 F.3d 584 (3d Cir. 1995), which itself cited to *Taylor*. (ECF No. 323, at 3.) While the Government is correct in its assertion that *McQuilkin* cited to *McClenton* and *McClenton* cited to *Taylor*, the Court does not agree with the Government that this chain of citation necessarily means that *McQuilkin* "appl[ied] *Taylor*"—at least not in any way that is material for resolving the questions at issue here.

To explain, there are two components of the *Taylor* decision which are relevant to this case. The first component, which took up the bulk of *Taylor's* analysis, was dedicated to "determin[ing] the meaning of the word 'burglary' as it is used in" ACCA. *Taylor v. United States*, 495 U.S. 575, 577, 580–599 (1990). As the *Taylor* Court explained:

> On the face of the federal enhancement provision, it is not readily apparent whether Congress intended "burglary" to mean whatever the State of the defendant's prior conviction defines as burglary, or whether it intended that some uniform definition of burglary be applied to all cases in which the Government seeks a § 924(e) enhancement. And if Congress intended that a uniform definition of burglary be applied, was that definition to be the traditional common-law definition, or one of the broader "generic" definitions articulated in the Model Penal Code and in a predecessor statute to § 924(e), or some other definition specifically tailored to the purposes of the enhancement statute?

*Id.* at 580 (footnote omitted).

After extensively canvassing the legislative history, the *Taylor* Court determined that it was "implausible that Congress intended the meaning of 'burglary' for purposes of § 924(e) to depend on the definition adopted by the State of conviction," and concluded instead that for the

purposes of ACCA, burglary "must have some uniform definition independent of the labels employed by the various States' criminal codes." *Id.* at 590, 592. The Court then moved to discern that "uniform definition" of burglary, first rejecting the common-law definition as "arcane" and outdated, and then rejecting a narrower definition put forward by Mr. Taylor, before finally settling on a "generic, contemporary meaning" grounded in the way "in which the term is now used in the criminal codes of most States," which also "approximate[d] that adopted by the drafters of the Model Penal Code." *Id.* at 592–598, 598 n.8.

Only after the *Taylor* Court had concluded that the question of whether a particular conviction qualified as "burglary" for the purposes of ACCA did not depend on "its exact definition or label," and only after it then recognized that some states "define burglary more broadly" than the generic definition, did the Court reach the second component of its decision: answering the question of "whether the sentencing court in applying [ACCA] must look only to the statutory definitions of the prior offenses, or whether the court may consider other evidence concerning the defendant's prior crimes." *Id.* at 599–600. On that question, the *Taylor* Court concluded that "Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions." *Id.* at 600.

In the end, the *Taylor* Court remanded the case to the Court of Appeals because it concluded that "most but not all [of] the former Missouri statutes defining second-degree burglary include all the elements of generic burglary" but that it could not determine "which of those statutes were the bases for Taylor's prior convictions." *Id.* at 602. In other words, the resolution of the *Taylor* decision at the Supreme Court involved the need for further analysis to determine whether

25

a specific conviction denominated "burglary" under state law qualified as "burglary" for the purposes of ACCA's enumerated offense clause.

Returning to the Government's argument in this case, *McClenton's* citation to *Taylor* related to *Taylor's* second analytical component: it was for the proposition that the Court should not examine the facts underlying a prior conviction when determining whether it is a predicate crime of violence under U.S.S.G. § 4B1.2. *See* 53 F.3d 584, 588, 588 n.8 (3d Cir. 1995) (citing *Taylor*, 495 U.S. at 597). Importantly—and just as in *McQuilkin*—the *McClenton* court made no reference to *Taylor's* first analytical component. That is, *McClenton* did not examine whether the specific burglary convictions alleged to be career offender predicates in that case were broader (as a matter of their required elements) than the generic version of "burglary of a dwelling" that was then-enumerated in § 4B1.2. In other words, *McQuilkin* did follow *McClenton* (which followed *Taylor*) in declining to look at the specific *facts* underlying a conviction when determining whether that conviction constitutes a crime of violence. But neither *McQuilkin* nor *McClenton* contains any facial indication that they followed *Taylor's* other dictate—that the particular *statute* of conviction should be compared to the generic form of the offense.[19]

---

[19] With that said, this Court is not aware of any Third Circuit precedent prior to *McQuilkin* which applied a "full" *Taylor* analysis in the context of the career offender provisions in U.S.S.G. § 4B1.2 (including the "comparative" portion of *Taylor* which defined a generic offense with which to compare the putative career offender predicate offenses).

As a matter of fact, in addition to *McQuilkin* (aggravated assault) and *McClenton* (burglary), this Court has identified other Third Circuit decisions, involving the same provisions of U.S.S.G § 4B1.2, which make reference to *Taylor's* bar on considering the underlying facts of the predicate convictions while simultaneously not performing the "comparative" portion of the *Taylor* analysis. *See, e.g., United States v. Butler*, 208 F. App'x 167, 169 (3d Cir. 2006) (quoting *McQuilkin* for the proposition that "there is no need to inquire into the facts of a prior conviction if the 'predicate conviction is enumerated as a "crime of violence" in [the] Application Note ... to § 4B1.2,'" and then stating that "[m]anslaughter, as the Application Note clearly states, is among the specifically enumerated crimes qualifying as a crime of violence").

The Court also notes that in establishing that the full *Taylor* analysis should apply in cases involving the enumerated offense clause of § 4B1.2, the *Marrero* court cited cases from the Second, Fourth, Tenth, and Eleventh Circuits. 743 F.3d 389, 399–400 (3d Cir. 2014) (collecting cases). The only citation to the Third Circuit on that point

26

On the other hand, just two weeks after *McClenton* was issued and more than a year before *McQuilkin*, a different Third Circuit panel cited *Taylor* for the proposition that "the reference to 'burglary' [in ACCA] was not intended to include all crimes denominated 'burglaries' under state law." *United States v. Watkins*, 54 F.3d 163, 166 (3d Cir. 1995). In contrast to *McQuilkin* and *McClenton*, which involved the career offender provisions in § 4B1.2, *Watkins* involved the same ACCA provisions as *Taylor*. This difference in the source of the involved enhancement provisions may explain the divergent treatment of the predicate offenses at issue in *Watkins* and *McClenton*, both of which involved burglary. However, *Watkins* illustrates that the "comparative" portion of the *Taylor* analysis was well-recognized by the Third Circuit before *McQuilkin*, at least in the ACCA context.

Moreover, in 1994 (two years before *McQuilkin*), the Third Circuit explained in *United States v. Thomas* that there is "no principled way to distinguish a challenge to a prior conviction used to justify an enhancement under the guidelines from a prior conviction used to justify an enhancement under the Armed Career Criminal Act." 42 F.3d 823, 824 (3d Cir. 1994). While *Thomas* concerned the permissibility of constitutional challenges to prior convictions at the time they are used for sentencing enhancements and did not deal with the specific issues raised in *Taylor*, the decision in *Thomas* demonstrates that the Third Circuit was cognizant of the parallels between ACCA and the career offender Guidelines and perceived a need to treat and then analyze those provisions similarly in the contexts relevant here.[20]

---

was to *United States v. Watkins*, 54 F.3d 163 (3d Cir. 1995), which, as discussed below, involved ACCA rather than U.S.S.G. § 4B1.2. Mr. Green acknowledges this reality and argues that *Marrero* "appears to mark the beginning of the Third Circuit's application of *Taylor* analysis in the Guideline enumerated-offense interpretation context." (*See* ECF No. 322, at 5 (citing 743 F.3d 389).)

[20] As it happens, when the *McClenton* court cited *Taylor*, it paired that citation to *Taylor* with a citation to *Thomas* for the proposition that *Taylor's* "categorical approach" should apply in the context of the career offender Guidelines

Thus, when viewed in combination, *Watkins* and *Thomas* strike this Court as providing a substantial basis to conclude that *Taylor's* full comparative analysis should have been applied in the context of § 4B1.2 at the time *McQuilkin* was decided. However, while it is true that there is no evidence on the face of the *McQuilkin* opinion that the court performed such a comparative analysis, *McQuilkin* does not appear to have been an outlier in this regard, *see supra* note 19, and this Court cannot say that *McQuilkin's* failure to do so was directly contrary to any then-existing precedent of the Third Circuit or the Supreme Court.

But regardless of whether *McQuilkin's* approach was correct at the time that case was decided, there is no question that the subsequent decision by the Third Circuit in *United States v. Marrero* straightforwardly held that "the *Taylor* analysis must be applied in enumerated-offense cases" involving the career offender Guidelines. 743 F.3d 389, 399 (3d Cir. 2014). The *Marrero* court explained that the district court had erred when it failed to compare the elements of the crime of conviction (Pennsylvania's third-degree murder statute) to the generic form of "murder"—even though "murder" was listed as an enumerated offense in the application notes to § 4B1.2. *Id.* Thus, while the *Marrero* opinion never says so in as many words, *Marrero's* requirement of a full *Taylor* analysis—including the comparative portion—appears to be a straightforward, if implicit, repudiation of the approach taken in *McQuilkin*.[21] And the Third Circuit has since applied the full *Taylor* analysis in additional precedential opinions involving the enumerated offense clause of

---

context as well as in the context of ACCA. *See* 53 F.3d at 588 n.8. But as discussed above, *McClenton* then stopped short of conducting a full *Taylor* analysis in the Guidelines context.

[21] To layer on even more complexity, despite seemingly repudiating a large portion of *McQuilkin's* analytical framework, the *Marrero* court affirmatively cited *McQuilkin* in its decision. The citation was for the proposition that "offenses listed [in the application notes] should be considered 'enumerated offenses.'" *Marrero*, 743 F.3d at 399. But as discussed above with respect to *McQuilkin*, this portion of *Marrero* has been seriously undermined if not overturned by *Nasir*. As a result, the Court does not find *Marrero's* citation to *McQuilkin* to be particularly instructive from today's perspective.

§ 4B1.2(a). *E.g.*, *United States v. Graves*, 877 F.3d 494 (3d Cir. 2017); *United States v. McCants*, 952 F.3d 416 (3d Cir. 2020).[22]

      ii.      For the above-stated reasons, this Court will not rely on *McQuilkin* to resolve this case.

The Third Circuit's *en banc* decision in *United States v. Nasir* represents a fundamental shift in how courts in this circuit are to treat the commentary to the Sentencing Guidelines. That shift is apparent if not obvious from the *Nasir* decision itself, from Judge Bibas' concurrence expressing the views of six members of the *Nasir en banc* Court, and from the subsequent precedential opinions in *Abreu* and most notably in *Adair*. And yet on its face, *Nasir* explicitly overruled only *United States v. Hightower*. *See* 17 F.4th 459, 472 (3d Cir. 2021) (overruling 25 F.3d 182 (3d Cir. 1994)); *see also id.* at 472 (Bibas, J., concurring) ("[T]he *narrow scope* of today's holding hints at a broader problem." (emphasis added)). Thus, the key question remaining is whether the *en banc Nasir* decision, despite not explicitly overruling or even mentioning *McQuilkin*, so undercuts that decision's precedential value that it is no longer binding on this Court.

As a general rule, there are—appropriately and of necessity—very significant constraints on this Court's authority to call into question the continued force of a precedential holding of the

---

[22] As indicated in the prior note, *Marrero* suffers from the same infirmity as *McQuilkin* with respect to its deference to the commentary in light of *Nasir* and *Adair*. *See supra* n.21. If this Court were considering *Marrero* in a vacuum, it would therefore have concerns about relying on *Marrero's* holding that a full *Taylor* comparative analysis is required for enumerated offenses (and *Marrero's* corresponding implicit repudiation of *McQuilkin's* contrary holding that enumeration itself is dispositive). However, cases like *Graves* and *McCants* (both of which involve crimes that were then-enumerated in the Guidelines' text rather than the commentary and thus do not suffer from the *Nasir* issue) reaffirm that *Marrero's* endorsement of the full *Taylor* analysis remains analytically sound; in this Court's view, those cases also reinforce *Marrero's* implicit repudiation of *McQuilkin*. And even assuming that its precedential value is diminished after *Nasir*, *Marrero* remains a useful and persuasive illustration of the prevailing analytical framework in this circuit.

Third Circuit. For example, under Section 9.1 of the Internal Operating Procedures ("IOPs") of our Court of Appeals, the holding of a precedential Third Circuit panel decision is binding on subsequent panels of that Court—and, necessarily, on this Court—and can generally only be overruled by an *en banc* decision of the Court of Appeals or by an opinion of the Supreme Court. *See Pardini v. Allegheny Intermediate Unit*, 524 F.3d 419, 426 (3d Cir. 2008); *Loftus v. Se. Pa. Transp. Auth.*, 843 F. Supp. 981, 984 (E.D. Pa. 1994).

The Third Circuit's approach to Supreme Court precedent also counsels that this Court should proceed with caution in concluding that a precedential Third Circuit panel opinion has been overruled by a later *en banc* decision of the Court of Appeals, where the later *en banc* decision does not directly and explicitly reference that prior panel opinion but at the same time directly undercuts the basis for the prior decision. The Court of Appeals has explained that it does not "possess the authority to declare that the Supreme Court has implicitly overruled on of its own decisions," *United States v. Leahy*, 438 F.3d 328, 332 (3d Cir. 2006), and that where "a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of cases, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Id.* (quoting *United States v. Ordaz*, 398 F.3d 236, 241 (3d Cir. 2005) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989))). Reasoning by analogy, *Leahy* suggests that when this Court is faced with a Third Circuit precedent that is directly on point, but which rests on reasons rejected by the Supreme Court or an *en banc* panel of the Court of Appeals, this Court remains bound by the case which directly controls.

On the other hand, there are cases which indicate that a panel of the Third Circuit is authorized to depart from that Court's own existing precedents under certain circumstances, even

absent express *en banc* repudiation of those specific precedents. For example, in *Karns v. Shanahan*, a panel of the Third Circuit held that "a panel may revisit a prior holding of the [Third Circuit] 'which conflicts with intervening Supreme Court precedent,'" at least where that intervening precedent "unquestionably presents an intervening shift in the applicable . . . analytical framework." 879 F.3d 504, 515 (3d Cir. 2018) (quoting *In re Krebs*, 527 F.3d 82, 84 (3d Cir. 2008)).[23]

This case is particularly challenging because it appears to fall within a gap in the rules dictating when this Court may (or perhaps more acutely here, must) depart from existing Third Circuit precedent. It is without doubt that this Court is duty bound to apply, and will apply, controlling legal rules as announced by precedential decisions of our Court of Appeals or by decisions of the Supreme Court. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 177 (3d Cir. 2017). There is similarly no question that if a precedential panel decision of our Court of Appeals is overruled expressly by that court sitting *en banc*, or by the Supreme Court, the prior panel decision goes by the wayside. And binding Third Circuit precedent dictates that when there exist conflicting "on point" precedential *panel* decisions of our Court of Appeals, this Court is obligated to apply, and will apply, the decision issued earlier in time and consider the latter decision to be *dicta*. *Pardini v. Allegheny Intermediate Unit*, 524 F.3d 419, 426 (3d Cir. 2008).

But the question here is whether this Court should disregard the precedential value of the directly on-point holding of *McQuilkin* in light of the Third Circuit's more recent *en banc* decision

---

[23] As noted at length in this Opinion, it is not clear to this Court, however, whether the same rules generally apply when a district court considers a precedential holding of its Court of Appeals in the face of a later *en banc* decision which strongly appears to have implicitly overruled that prior precedential panel decision. Then-Chief District Judge (and now Circuit Judge) Stark confronted an analogous issue involving the impact of a Supreme Court decision on a precedential panel Court of Appeals decision in *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, Civ. No. 04-cv-1371, 2018 WL 4804685, at *1-2 (D. Del. Oct. 4, 2018).

in *Nasir*—even though *Nasir* did not expressly overturn or even mention *McQuilkin* by name. This Court concludes that at least as to that specific question, the Court of Appeals plainly answered "yes" in *Adair*, and this Court should not give binding precedential weight to the opinion in *McQuilkin*. The *Adair* panel explained that where the interpretive commentary to a provision of the Sentencing Guidelines has the effect of expanding the reach of the Guideline beyond its own text, a sentencing court may not defer to the commentary unless such deference is warranted only after a complete and scrupulous application of the evaluative process mandated in *Kisor* and *Nasir*. 2022 WL 2350277, at *3. And the *Adair* court further clarified that any prior decision which deferred to the interpretive commentary without presciently complying with the *Kisor* process "does not automatically retain its controlling force." *Id.*

An examination of the *McQuilkin* opinion demonstrates that it did not display the prescience that *Adair* demands. Nor, in this Court's view, would the *McQuilkin* court have deferred to the application notes referencing aggravated assault had the court applied a *Kisor/Nasir* analysis to the text of § 4B1.2 as it read in 1996. And given that it is therefore highly unlikely that the *McQuilkin* court could have concluded that aggravated assault *was to be treated as* an enumerated offense, it is also highly unlikely that the *McQuilkin* court would have reached its ultimate holding—that § 2702(a)(1) is a crime of violence *because* aggravated assault should be treated as an enumerated offense.

Adding to the Court's serious *Nasir*-driven concern is the fact that there is no evidence on the face of the *McQuilkin* opinion that the Third Circuit defined a generic form of aggravated assault with which to compare 18 Pa. Cons. Stat. § 2702(a)(1), nor is there any evidence that the *McQuilkin* court compared § 2702(a)(1) to a "uniform definition" of any sort. *Contra Taylor v. United States*, 495 U.S. 575, 580 (1990). While *McQuilkin's* approach does not appear to have

32

been facially inconsistent with any binding precedent at that time—and in fact appears consistent with other then-existing cases involving § 4B1.2—this Court harbors little doubt that if *McQuilkin* were before the Third Circuit today, the Court of Appeals would apply a full *Taylor* analysis, in line with the approach it has taken in *Marrero*, *Graves,* and the cases that follow.

This Court thus concludes that the combination of *Nasir* as explained in *Adair* and the *Marrero/Graves/McCants* line of cases so fundamentally undermines the precedential and persuasive vitality of *McQuilkin* as it relates to Mr. Green's aggravated assault conviction that this Court can no longer rely on *McQuilkin* as "retaining controlling force" and being dispositive of its decision in this case. Therefore, the Court cannot end its analysis with a simple reference to *McQuilkin*. Given the fluid nature of the caselaw developments noted above, the observations of Judge Bibas in his *Nasir* concurrence, the recent precedential decision in *Adair*, the consequential nature of the sentencing issues at stake here, and the virtual certainty of an appeal of this Court's decision no matter how it comes out, the Court believes that it is obligated to dig deeper. Stopping short by simply referring to *McQuilkin* would in effect mean that this Court would be treating the *en banc* disposition in *Nasir* and the panel opinion in *Adair* as though they did not exist at all, or would be treating the decision in *Adair* as being only dicta, all of which this Court concludes that it is not free to do given the very direct language of *Adair*. As such, the Court will also proceed to conduct a *Taylor* "categorical approach" analysis with respect to § 2702(a)(1).[24]

---

[24] The Court concludes that it is especially appropriate for it to conduct a *Taylor* analysis here, considering the uncertainty surrounding the continuing vitality of *McQuilkin* post-*Nasir* and *Adair* and the need to avoid future delay should the Court of Appeals conclude that *McQuilkin* is not binding on this Court in light of *Nasir* and *Adair* or for other reasons. If Mr. Green is not a career offender, then he has already served well in excess of his Guidelines sentence, and his resentencing has already been significantly delayed by a series of stays of the proceedings here that have been necessitated by intervening and pending legal developments at the Court of Appeals and Supreme Court. (*See* ECF No. 308, at 4–5.)

**B. The outcome of *McQuilkin* is consistent with that generated by a "categorical approach" analysis**

This Court concludes that 18 Pa. Cons. Stat. § 2702(a)(1) is not broader than "generic" "aggravated assault" under the analytical framework outlined by *Taylor*, adopted by the Third Circuit in *Marrero*, and applied by the Court of Appeals in later decisions such as *Graves* and *McCants*. This Court's conclusion is based on its determination that the generic definition of aggravated assault includes offenses resulting in serious bodily injury that are committed with a *mens rea* of extreme indifference recklessness. And as it turns out, this conclusion matches the result that was reached in *McQuilkin*.

    i.       Analytical framework

As described above, the 2018 Sentencing Guidelines' enumerated offense clause defines a "crime of violence" to include any offense that "is murder, voluntary manslaughter, kidnapping, *aggravated assault*, [or certain other enumerated crimes]." U.S.S.G. § 4B1.2(a)(2) (emphasis added). In *Taylor v. United States*, the Supreme Court explained that when Congress or the Sentencing Commission refers to a specific offense, the term "must have some uniform definition independent of the labels employed by the various States' criminal codes" to avoid disparities between similar defendants. 495 U.S. 575, 592 (1990).

The "categorical approach" established in *Taylor* requires a comparison between the defendant's statute of conviction and the elements of the "generic" crime. *See id.* at 599. The Third Circuit has confirmed that this categorical approach applies to U.S.S.G. § 4B1.2 and has articulated a three-step analysis for its application. *See, e.g.*, *United States v. Marrero*, 743 F.3d 389, 399–400 (3d Cir. 2014); *United States v. Graves*, 877 F.3d 494, 501 (3d Cir. 2017). Under this approach,

a court must "first identify the elements of the state offense, then identify the elements of the generic offense, and finally determine whether the former are the same as or narrower than the latter." *Graves*, 877 F.3d at 501. If the state statute's elements are broader than the generic offense, then the statute does not constitute a "crime of violence" for the purpose of the Sentencing Guidelines. *Id.*

The specific provision of Pennsylvania law that Mr. Green was convicted under is § 2702(a)(1), which provides that a person is guilty of aggravated assault if he or she:

> attempts to cause serious bodily injury to another, or causes such
> injury intentionally, knowingly or *recklessly under circumstances*
> *manifesting extreme indifference to the value of human life.*

18 Pa. Cons. Stat. § 2702(a)(1) (emphasis added). The parties dispute whether generic aggravated assault includes extreme indifference recklessness and therefore whether the generic offense's elements are the same or narrower than those of the Pennsylvania statute. The Government argues that generic aggravated assault includes a *mens rea* of extreme indifference recklessness, making the Pennsylvania statute's elements commensurate with generic aggravated assault. (ECF No. 320, at 8–14.) Mr. Green argues that generic aggravated assault requires a *mens rea* greater than extreme indifference recklessness and is therefore narrower than the Pennsylvania statute. (ECF No. 322, at 6–14.) If the Government is correct, Mr. Green's aggravated assault conviction constitutes a crime of violence. If Mr. Green is correct, then it does not, and he is not a career offender.

To identify the elements of the Guidelines' generic aggravated assault offense, the Third Circuit counsels that a court must examine the "Model Penal Code (MPC), state laws, and learned treatises." *Graves*, 877 F.3d at 502. There appears to be some degree of tension within the Third Circuit's precedents as to how to weigh those various sources of authority. On the one hand, *Marrero* explains that the MPC is the "ideal starting point" for determining the generic form of an

35

offense, 743 F.3d at 400; on the other hand, *Graves* counsels that "the most important factor in defining the generic version of an offense is the approach of the majority of state statutes defining the crime." 877 F.3d at 504.

Beginning with the MPC, there is no dispute that its definition of aggravated assault includes offenses committed with a *mens rea* of extreme indifference recklessness—§ 2702(a)(1) corresponds almost exactly to MPC § 211.1(2)(a).[25] If a majority of states agree with the MPC, then the solution to this case is simple: the generic definition of aggravated assault covers extreme indifference recklessness. If not, then the Court must tackle the complicated question of how large a majority is required under *Graves* to overcome the MPC.[26] After an extensive review of the felony assault statutes in all 50 states and the District of Columbia,[27] the Court concludes that,

---

[25] In relevant part, the MPC provides that a person is guilty of aggravated assault if he "attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." MPC § 211.1(2)(a). The only difference with § 2702(a)(1) is the use of "intentionally" in § 2702(a)(1) versus "purposely" in MPC § 211.1(2)(a), a change which is of no import here.

[26] To explain, it is not clear from *Graves* exactly how large of a majority would be necessary to override a contrary definition in the MPC, and conversely, whether the MPC plus a substantial minority of states would "win out" over a narrow majority of states pointing in the opposite direction. The *Graves* court stated that the approach of the majority of states is "the most important of the factors to be considered" in defining the generic offense and that "[a]ffording predominant weight to the *majority* of states best recognizes that 'Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity.'" 877 F.3d at 504. (emphasis added) (quoting *United States v. Booker*, 543 U.S. 220, 253 (2005)). But the majority that was found to override the MPC in *Graves* was comprised of 38 states, and the court's holding could be construed as only determining that where "the MPC's definition of a crime differs in an important respect from the approach taken by a *significant majority* of states," the state majority definition should control. *Id.* at 503 (emphasis added). Whether a lesser majority would still control over the MPC is therefore less clear, and indeed, the *Graves* court specifically did not hold "that the approach of the majority of states will always be dispositive in crafting any federal definition of a crime." *Id.* at 504 n.46. Adding to the uncertainty within *Graves* is the fact that *Marrero* indicates that the MPC is the "ideal starting point" in defining the generic form of an offense. 743 F.3d at 400. If, however, the MPC can be overridden by a bare majority of states, it is hard to see what work the MPC is doing in determining the generic definition.

[27] For the purposes of the categorical analysis, the Court will refer to the District of Columbia as a "state," making the total count of "states" 51.

consistent with the MPC, a majority of states do proscribe relevant offenses committed with a *mens rea* of extreme indifference recklessness.[28]

    ii.    Defining the universe of statutes to be considered

The first step in determining the approach of the majority of state statutes is to define which statutes to include in the analytical pool. The Government argues that the Court should limit its examination to the twenty-four (24) states that have a crime that is expressly labelled "aggravated assault." (ECF No. 320, at 8.) Mr. Green contests the Government's approach of excluding states based on the "labels they assign to the crime." (ECF No. 322, at 9.) He instead proposes that the Court should consider all jurisdictions with substantively similar crimes regardless of whether those crimes are expressly labelled "aggravated assault," in line with the approach adopted by the Ninth Circuit in *United States v. Alberto Garcia-Jimenez*, 807 F.3d 1079 (9th Cir. 2015). (ECF No. 320, at 9.)

The Court agrees with Mr. Green that it should not limit its analysis to only those states with crimes expressly labeled "aggravated assault." In *Taylor*, the Supreme Court explained that it was "implausible" that Congress would have set up a sentencing scheme wherein the question of whether a defendant "would, or would not, receive a sentence enhancement based on exactly the same conduct" would depend on "whether the State of his prior conviction happened to" use a certain label for that conduct. 495 U.S. at 590–91; *see also Mathis v. United States*, 579 U.S. 500, 509 (2016) ("[T]he label a State assigns to a crime . . . has no relevance to whether than offense is an ACCA predicate."). This Court concludes that if labeling does not dictate whether a particular state statute is covered by the enumerated offense clause, then it should similarly not dictate

---

[28] As a result, the Court does not need to resolve the apparent tension between *Marrero* and *Graves*.

whether a particular statute falls into the pool of statutes used to determine the generic form of the enumerated offense in question.

But if the Court cannot look to the label assigned to a particular statute to determine whether it should be included in the pool, it needs some other way of identifying the set of statutes to include in its analysis. As a first step, the Court needs to define conceptually what types of conduct are covered by the label of "assault," so that it can then identify which subset of those statutes are considered sufficiently severe so as to be properly denominated "aggravated assault," and then finally determine whether a majority of that pool of so-defined "aggravated assault" statutes—however formally named—cover causing serious bodily injury recklessly under circumstances manifesting extreme indifference to the value of human life.

On the first step, the Court takes guidance from the approach outlined in *Marrero*. The question in that case was whether Pennsylvania's third-degree murder offense fell within the generic definition of "murder," as enumerated in § 4B1.2. 743 F.3d 389, 397–98 (3d Cir. 2014). In arriving at a generic definition of "murder," the *Marrero* Court began with definitions from the MPC and *Black's Law Dictionary*, before turning to the state-law definitions, which "var[ied] wildly." *Id.* at 400. This Court concludes that in addition to providing a useful starting point for determining the substance of the generic definition, the MPC can provide a baseline conceptual definition of "assault," which the Court can then use to identify state statutes implicating the same or substantially similar types of conduct.

The MPC defines "assault" in § 211.1; "simple assault" is defined in § 211.1(1), while "aggravated assault" is defined in § 211.1(2). Together, the simple and aggravated assault

38

provisions[29] in § 211.1 encompass three broad types of conduct or *"actus rei"*: 1) conduct which involves an attempt to put another in fear of bodily injury ("show of violence"); 2) conduct which involves an attempt to cause bodily injury to another ("attempted battery"); and 3) conduct which actually results in bodily injury to another ("completed battery"). *Black's Law Dictionary* contains three criminal law definitions of "assault" which correspond to these same three forms of conduct. *Assault*, *Black's Law Dictionary* (11th ed. 2019). This Court concludes that these three forms of conduct—show of violence, attempted battery, and completed battery—comprise a "common definitional strand" underlying the generic definition of "assault." *Marrero*, 743 F.3d at 400.

Of course, not all "assault" is "aggravated assault," and the Court needs some way to distinguish statutes that are sufficiently "aggravated" to include in its analytical pool.[30] One natural place would be the division between felony and misdemeanor offenses, but the parties disagree

---

[29] § 211.1. Assault

(1) Simple assault: a person is guilty of simple assault if he:

   (a) attempts to cause or purposely, knowingly or recklessly causes bodily injury to another; or

   (b) negligently causes bodily injury to another with a deadly weapon; or

   (c) attempts by physical menace to put another in fear of imminent serious bodily injury.

Simple assault is generally a misdemeanor unless committed in a fight entered into by mutual consent, in which case it is a petty misdemeanor.

(2) Aggravated assault: a person is guilty of aggravated assault if he:

   (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; or

   (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon.

Aggravated assault under section (a) is categorized as a felony of the second degree whereas assault under (b) qualifies as a felony of the third degree.

[30] *Black's Law Dictionary* explains that "aggravated assault" is "[c]riminal assault accompanied by circumstances that make it more severe." *Aggravated Assault*, *Black's Law Dictionary* (11th ed. 2019). This Court's goal is essentially to determine whether a majority of states consider assaultive conduct (and more specifically, completed battery conduct) to be sufficiently severe as to be properly deemed "aggravated" if it results in serious bodily injury and is committed with a *mens rea* of recklessness under circumstances manifesting extreme indifference to the value of human life.

about whether all felonies should be included. This question is complicated by the fact that in addition to varying in how they define and label various offenses, states employ a wide variety of schemes for grading criminal conduct. The MPC, for example, has three (3) levels of felony offense, as does the criminal code of Pennsylvania; North Carolina's code, on the other hand, has ten (10).[31] Mr. Green argues that the Court should follow *Garcia-Jimenez*, which included only "first-degree" felony statutes in its analysis. (ECF No. 322, at 13–14; *see also* 807 F.3d at 1085 n.5 (focusing only on New Hampshire's first-degree assault statute when its second-degree statute covers mere recklessness).) The Government argues in response that the Ninth Circuit erred in *Garcia-Jimenez* by "focus[ing] only on 'first-degree assault' statutes," "miss[ing] second- or third-degree felony assault statutes in Hawaii, Missouri, New Hampshire, and Oregon that include extreme-indifference recklessness." (ECF No. 323, at 9.)

The Court agrees with the Government and concludes that the most principled place to draw the line is between felonies and misdemeanors. To begin with, the Court takes guidance from the Sentencing Guidelines provisions at issue. The Court notes that the operative definition of "crime of violence" covers "any offense under federal or state law, punishable by imprisonment for a term exceeding one year." U.S.S.G. § 4B1.2(a). This definition corresponds to the minimum punishment typically associated with a felony conviction. *See Felony*, *Black's Law Dictionary* (11th ed. 2019) ("A serious crime usu. punishable by imprisonment for more than one year or by death"). And the "career offender" provision in § 4B1.1 subjects a defendant to heightened penalties if they have three or more qualifying felony convictions—it does not specify that the felonies must be of a certain degree. Drawing the line at felony versus misdemeanor is also

---

[31] MPC § 6.06; 18 Pa. Cons. Stat. § 106 (2022); N.C. Gen. Stat. § 15A-1340.17 (2022).

consistent with the MPC[32] and the approach of at least one circuit that has considered this issue. *See United States v. Schneider*, 905 F.3d 1088, 1094–95 n.3–4 (8th Cir. 2018).

To summarize, the Court concludes that "assault" conceptually contains three types of conduct—"show of violence," "attempted battery," and "completed battery"—and will therefore consider in its analytical pool all statutes covering those types of conduct, whether they are denominated "assault," "battery," "assault and battery," or something else entirely.[33] The Court further concludes that the best way to determine whether a state considers a given offense sufficiently severe so as to be denominated "aggravated" is whether it punishes that offense as a felony. As such, the Court will limit its analytical pool to statutes that are graded as a felony offense, whatever the level of felony, and no matter whether they are denominated "first-degree," "second-degree" or otherwise.

---

[32] MPC § 211.1(1) ("Simple Assault is generally a misdemeanor."); MPC § 211.1(2) ("Aggravated assault under section (a) is categorized as a felony of the second degree whereas assault under (b) qualifies as a felony of the third degree.")

[33] The Court collected all of the statutes for each state that covered one or more of the three types of conduct encompassed by the broad term "assault." However, because the only dispute here concerns the required *mens rea* for "completed battery" conduct, the Court as a practical matter focused its analysis on the particular statutes for each state that dealt with completed batteries. This list included 32 states which formally call this conduct "assault," 14 which call it "battery," 3 which call it "assault and battery," and 2 which call it "malicious" or "unlawful" "wounding." In addition to its "battery" statute, Wisconsin has a separate crime of "First-Degree Reckless Injury," which the Court also considered in its analytical pool.

In this respect, this Court's list departs from the decisions in both *United States v. Schneider* and *United States v. Garcia-Jimenez*, which this Court concludes "missed" certain completed battery statutes by focusing only on those formally denominated "assault." Arkansas provides a useful illustration. It has separate statutes for "Aggravated assault" (Ark. Code Ann. § 5-13-204 (2021)) and "Battery in the first degree" (Ark. Code Ann. § 5-13-201 (2021)). Among other things, the "Battery in the first degree" statute covers "caus[ing] serious physical injury to another person under circumstances manifesting extreme indifference to the value of human life." Ark. Code Ann. § 5-13-201 (2021). But in both *Schneider* and *Garcia-Jimenez*, the Courts of Appeals considered only Arkansas' "Aggravated assault" statute, which is framed in terms of risk-creation rather than completed effect and which is graded as a lower level of offense than is "Battery in the first degree." *Schneider*, 905 F.3d 1088, 1094 n.3 (8th Cir. 2018); *Garcia-Jimenez*, 807 F.3d 1079, 1085 n.6 (9th Cir. 2015).

Having defined the pool of statutes for its analysis, the Court turns to the operative question: in what share of states do the so-defined "aggravated assault" statutes cover recklessly causing serious bodily injury to another under circumstances manifesting extreme indifference to the value of human life?[34]

---

[34] Here the Court does follow *Garcia-Jimenez* in considering a statute to cover recklessly causing serious bodily injury to another under circumstances manifesting extreme indifference to the value of human life only if no other aggravating circumstances are required. *See* 807 F.3d at 1085 n.5. For example, Nebraska's second-degree assault statute makes it a felony to "[r]ecklessly cause[] serious bodily injury to another person *with a dangerous instrument*." Neb. Rev. Stat. § 28-309 (emphasis added). While the required *mens rea* for that offense is mere recklessness, which would ordinarily be a lower requirement than extreme indifference recklessness, in order to be conservative in its calculations, the Court did not count Nebraska as being broader than § 2702(a)(1) because it has the additional requirement that the offense be committed with a dangerous instrument.

### iii.    Results

The Court concludes that the "aggravated assault" statutes of at least twenty-seven (27) states cover recklessly causing serious bodily injury to another under circumstances manifesting extreme indifference to the value of human life.[35]

---

[35] In reality the number may be as high as thirty-six (36).

In order to be conservative in its calculations, this Court included only those states in the majority for which it felt substantially certain that extreme indifference recklessness was covered by their aggravated assault provisions, either due to the text of the statute itself, or due to clear caselaw that did not require any inference. In addition to the twenty-seven (27) states the Court ultimately chose to include in the majority, however, the Court identified an additional nine (9) states which have aggravated assault statutes that plausibly (and in some cases, probably) could be read to cover extreme indifference recklessness, when viewed in combination with interpretive caselaw. *See* Cal. Penal Code §§ 242, 243 (West 2022); Colo. Rev. Stat. § 18-3-202 (2022); Ga. Code Ann. §§ 16-5-23.1 to -5-24; Mont. Code Ann. § 45-5-202 (2021); N.C. Gen. Stat. § 14-32.4 (2022); Okla. Stat. tit. 21, §§ 642, 646 (2022); R.I. Gen. Laws § 11-5-2 (2022); S.C. Code Ann. § 16-3-600 (2022); Va. Code Ann. § 18.2-51.2 (2022).

For example, North Carolina's criminal code does not specifically define "assault." But a recent Fourth Circuit case defines three possible formulations of assault under the common law. *United States v. Simmons*, 917 F.3d 312, 318–19 (4th Cir. 2019), as amended (Mar. 6, 2019). *Simmons* explains that each formulation requires intent, which can be established through "culpable negligence," which the court describes as a lower standard than recklessness. *Id.* at 319 ("Under any of the three formulations, an assault conviction will be sustained only if the defendant acts intentionally. This intent to act 'can be established through proof of "culpable negligence."' 'Culpable negligence' is 'such recklessness or carelessness, proximately resulting in injury or death, as imports a thoughtless disregard of consequences or a heedless indifference to the safety and rights of others.' As we explained in *Peterson* and reiterated in *Vinson*, culpable negligence's 'focus on thoughtless disregard' renders it 'a lesser standard of culpability than recklessness, which requires at least "a conscious disregard of the risk."'" (citations to state law omitted)).

Other states appear to only require an intent to carry out a certain action, but not necessarily to make forcible contact with the victim. *See, e.g., State v. Lemmon*, 692 P.2d 455, 458 (Mont. 1984) ("Lemmon also argues that evidence must prove he intended to 'beat her, hit her, or strike her.' While the record contains sufficient evidence to convince the jury this was his intent, the prosecution does not have to prove specific intent. This argument has also been addressed by this Court. 'The fatal flaw in defendant's argument is that aggravated assault is not a specific intent crime. . . . The legislature did not intend to require any other mental state in addition to "purposely" or "knowingly."'" (citation omitted)). This Court did not count either North Carolina or Montana in the majority. *See also James v. State*, 176 Cal. Rptr. 3d 806, 811 (Cal. Dis. Ct. App. 2014); *People v. Esparza-Treto*, 282 P.3d 471, 474 (Colo. App. 2011); *Grant v. State*, 572 S.E.2d 38, 41 (Ga. Ct. App. 2002); *Quinn v. State*, 485 P.2d 474, 476 (Okla. Crim. App. 1971); *United States v. Rose*, 896 F.3d 104, 114 (1st Cir. 2018); *State v. Fennell*, 531 S.E.2d 512, 517 (S.C. 2000); *Knight v. Commonwealth*, 733 S.E.2d 701, 705 (Va. Ct. App. 2012).

Ultimately, this Court identified just fifteen (15) states where it was confident that the aggravated assault statutes *did not* cover causing serious bodily injury recklessly under circumstances manifesting extreme indifference to the value of human life. *See* Fla. Stat. §§ 784.03, 784.045 (2022); Idaho Code §§ 18-903; 18-907 (2022); 720 Ill. Comp. Stat. Ann. §§ 5/12-3 to -3.05 (2022); Ind. Code § 35-42-2-1.5 (2022); Iowa Code §§ 708.1–708.2; 14 La. Stat. Ann. §§ 33, 34.1 (2021); Md. Code Ann., Crim. Law § 3-202 (LexisNexis 2022); Mich. Comp. Laws § 750.84 (2022); Minn. Stat. §§ 609.02, 609.221 (2022); Neb. Rev. Stat. § 28-308 (2022); Nev. Rev. Stat. Ann. § 200.481 (2021); N.M. Stat. Ann. § 30-3-5 (2022); Ohio Rev. Code Ann. §§ 2903.11–2903.12 (LexisNexis 2022); Wash. Rev. Code §§ 9A.36.011, 9A.36.021 (2022); W. Va. Code § 61-2-9 (2022). These states generally require that the defendant have

To begin with, eleven (11) states cover extreme indifference recklessness in the text of their statutes: Alabama, Connecticut, Kentucky,[36] Mississippi, New Jersey, New York, Oregon, Pennsylvania, Vermont, Wisconsin, and Wyoming.[37] An additional eleven (11) states cover bare

---

the specific intent to make forcible contact with the victim, *see, e.g.*, *State v. Billings*, 54 P.3d 470, 473 (Idaho Ct. App. 2002) ("Thus, proof of a violation of subsection (a) requires a showing that the accused purposely used force or violence upon the victim's body. Although it is not necessary that the defendant know that the act is illegal or intend that it cause bodily injury, it is necessary that the defendant intend a forcible or violent contact with the other person."), or go further to require that the defendant intended to harm or seriously harm the victim, *see, e.g.*, *Johnson v. State*, No. 793, Sept. Term, 2020, 2021 WL 4552405, at *1 (Md. Ct. Spec. App. Oct. 5, 2021) ("To sustain a conviction for first-degree assault, the State must prove a defendant's 'specific intent to cause, or attempt to cause, serious physical injury.'" (quoting *Dixon v. State*, 772 A.2d 283, 301 (Md. 2001))).

[36] Kentucky requires an extra word of explanation. Under Kentucky law, a person is guilty of aggravated assault in the first-degree if "[u]nder circumstances manifesting extreme indifference to the value of human life he *wantonly* engages in conduct which creates a grave risk of death to another and thereby causes serious physical injury to another person." Ky. Rev. Stat. Ann. § 508.010(1)(b) (West 2022) (emphasis added). The Government appears to be of the view that Kentucky's statute does not cover "extreme indifference recklessness." (*See* ECF No. 323, at 10 n.2).

This Court, however, does not agree with the Government's assessment. Kentucky appears to call what most states call "recklessness," "wanton" and what most states call "negligence," "recklessness." *Compare* MPC § 2.02 ("A person acts *recklessly* with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."; "A person acts *negligently* with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation." (emphasis added)); *with* Ky. Rev. Stat. Ann. § 501.020 (West 2022) ("A person acts *wantonly* with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto."; "A person acts *recklessly* with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." (emphasis added)).

This Court will not treat Kentucky differently simply because it chooses to assign the label of "wanton" to conduct that for the purpose of this analysis can be appropriately deemed "reckless."

[37] Ala. Code § 13A-6-20 (2022); Conn. Gen. Stat. § 53a-59 (2022); Ky. Rev. Stat. Ann. § 508.010 (West 2022); Miss. Code Ann. § 97-3-7 (2022); N.J. Stat. Ann. § 2C:12-1 (West 2022); N.Y. Penal Law § 120.10 (McKinney 2022); Or. Rev. Stat. § 163.165 (2022); 18 Pa. Cons. Stat. § 2702 (2022); Vt. Stat. Ann. tit. 13, § 1024 (2021); Wis. Stat. § 940.23 (2022); Wyo. Stat. Ann. § 6-2-502 (2022). Wisconsin is included here by virtue of its "First-Degree Reckless Injury" statute, Wis. Stat. § 940.23, which criminalizes "recklessly caus[ing] great bodily harm to another human being under circumstances which show utter disregard for human life," and is a Class D felony, carrying a maximum term of imprisonment of 25 years. Wis. Stat. § 939.50(3)(d) (2022).

recklessness in their aggravated assault statutes—with no further requirement that it be accompanied by extreme indifference to the value of human life: Alaska, Arizona, Delaware, Hawaii, Kansas, Maine, Missouri, New Hampshire, North Dakota,[38] Tennessee, and Texas.[39] Finally, there are five (5) states where caselaw makes clear that either recklessness or extreme indifference recklessness is covered: Arkansas,[40] Massachusetts,[41] South Dakota,[42] Utah,[43] and the

---

[38] North Dakota's aggravated assault statute criminalizes "[w]illfully caus[ing] serious bodily injury to another human being," while a separate provision defines "willfully" to include intentional, knowing, and reckless acts. N.D. Cent. Code §§ 12.1-17-02, 12.1-02-02(1); *see also United States v. Schneider*, 905 F.3d 1088, 1094 (8th Cir. 2018) ("Subsection (a) prohibits willfully causing serious bodily injury. Recall that the term 'willfully' includes intentional, knowing, and reckless acts. N.D. Cent. Code Ann. § 12.1-02-02(1)(e). The last of these, recklessness, is the least culpable mental state listed. *Id.* § 12.1-02-02(1)(c) (defining reckless conduct as acting 'in conscious and clearly unjustifiable disregard of a substantial likelihood of the existence of the relevant facts or risks, such disregard involving a gross deviation from acceptable standards of conduct'). Thus, subsection (a) extends, at its broadest point, to reckless behavior.").

[39] Alaska Stat. § 11.41.210 (2021); Ariz. Rev. Stat. Ann. §§ 13-1203 to -1204 (2022); Del. Code Ann. tit. 11, § 612 (2022); Haw. Rev. Stat. § 707-711 (2022); Kan. Stat. Ann. § 21-5413 (2022); Me. Stat. tit. 17-a, § 208 (2022); Mo. Rev. Stat. § 565.052 (2021); N.H. Rev. Stat. Ann. § 631:2 (2022); N.D. Cent. Code § 12.1-17-02 (2021); Tenn. Code Ann. §§ 39-13-101 to -13-102 (2022); Tex. Penal Code Ann. §§ 22.01, 22.02 (West 2021).

[40] Ark. Code Ann. § 5-13-201 (2021); *Hoyle v. State*, 268 S.W.3d 313, 318–19 (Ark. 2007) ("Here, the evidence showed that Hoyle acted recklessly under circumstances manifesting extreme indifference to human life. Specifically, the evidence demonstrated that Hoyle drove a fully loaded commercial vehicle weighing over 82,000 pounds while under the influence of methamphetamine. . . . It is apparent based on the evidence in this case that Hoyle exhibited reckless conduct that involved a conscious disregard of a perceived risk. Accordingly, we cannot say that the trial court erred in denying Hoyle's motion for directed verdict on the first-degree battery charge.").

[41] Mass. Gen. Laws ch. 265, § 13A (2021); *Commonwealth v. Pease*, 731 N.E.2d 92, 94 (Mass. App. Ct. 2000) ("Wanton and reckless conduct may substitute for the 'intentional conduct' element necessary for a battery."); *Commonwealth v. Welansky*, 55 N.E.2d 902, 910 (Mass. 1944) ("The judge charged the jury correctly when he said, 'To constitute wanton or reckless conduct, as distinguished from mere negligence, grave danger to others must have been apparent and the defendant must have chosen to run the risk rather than alter his conduct so as to avoid the act or omission which caused the harm.'").

[42] S.D. Codified Laws § 22-18-1.1 (2022); *State v. Rash*, 294 N.W.2d 416, 418 (S.D. 1980) ("Appellant argues that the Model Penal Code, Section 211.1(2) sets forth a definition of aggravated assault which is quite similar to our statute except that the Model Penal Code includes the words 'purposely, knowingly or recklessly.' Arguably, the first two would require a specific intent while the third would not. He states that by omitting the word 'recklessly,' the legislature obviously meant to make the crime one of specific intent. We believe that the opposite would also then be true; that by leaving out 'purposely and knowingly,' they meant to make the statute one of general intent. In reading the statute as written, we conclude that the legislature intended for the statute to cover all acts, so long as (1) the person either attempted to cause or actually did cause serious bodily injury to another, and (2) the circumstances under which the act was done manifested extreme indifference to the value of human life. The statute says nothing about intent.").

[43] Utah Code Ann. § 76-5-103 (LexisNexis 2022); *State v. Seach*, 483 P.3d 1265, 1271 (Utah Ct. App. 2021) (citation omitted) ("Although the aggravated assault statute does not specify a particular mental state, or *mens rea*, that the State must prove to establish criminal liability, a separate statute provides that, where the offense in question 'does not involve strict liability,' and does not otherwise specify the level of mens rea required, then proving the defendant's

District of Columbia.[44]

Thus, the final count is twenty-seven to twenty-four (27 to 24) in favor of including extreme indifference recklessness as a covered level of *mens rea* in the relevant statutes. That represents a majority—albeit a slim one—of fifty-three (53) percent.[45] But when viewed in conjunction with the MPC's definition, which is consistent with the majority, the Court concludes that its review of state statutes supports the conclusion that the generic version of "aggravated assault" encompasses recklessly causing serious bodily injury to another under circumstances manifesting extreme indifference to the value of human life.

Because the Court concludes that generic aggravated assault includes extreme-indifference recklessness, 18 Pa. Cons. Stat. § 2702(a)(1)'s inclusion of an extreme-indifference recklessness *mens rea* does not make that statute broader than the generic definition of aggravated assault. Mr. Green's aggravated assault conviction under § 2702(a)(1) therefore qualifies as a "crime of violence" under U.S.S.G. § 4B1.2(a)(2). Combined with Mr. Green's two (2) qualifying narcotics offenses—the status of which is uncontested—Mr. Green's aggravated assault conviction makes three (3) qualifying offenses, requiring that he be designated as a "career offender" under U.S.S.G. § 4B1.1.

---

'intent, knowledge, or recklessness shall suffice to establish criminal responsibility,' *id.* § 76-2-102. Aggravated assault is not a strict liability offense. *See id.* § 76-5-103(1). Therefore, because the aggravated assault statute does not otherwise specify the required mens rea, the State was required to prove that Seach acted intentionally, knowingly, or recklessly. *See id.* §§ 76-2-102, -5-103(1).").

[44] D.C. Code § 22-404.01 (2022); *Perry v. United States*, 36 A.3d 799, 817 (D.C. 2011) ("In order to give effect to the statute as a whole, subsection (a)(2) must be read as requiring a different type of mental element—gross recklessness—as shown by 'intentionally or knowingly' engaging in conduct that, in fact, 'creates a grave risk of serious bodily injury,' and doing so 'under circumstances manifesting extreme indifference to human life.'").

[45] As discussed at note 35, *supra*, the actual share may be much higher.

IV.    **Conclusion**

This Court's categorical analysis demonstrates that a conviction for aggravated assault under 18 Pa. Cons. Stat. § 2702(a)(1) constitutes a "crime of violence" under U.S.S.G. § 4B1.2(a)(2). Accordingly, the Court sustains the Government's objections to the Probation Office's PSR Revisions. Mr. Green's conviction under § 2702(a)(1) constitutes a "crime of violence" under the Sentencing Guidelines, and he has the three predicate convictions necessary to qualify as a "career offender" under U.S.S.G. § 4B1.1. While this conclusion is consistent with that dictated by the holding in *United States v. McQuilkin*, 97 F.3d 723 (3d Cir. 1996), the Court does not rely only on *McQuilkin* in determining Mr. Green's career offender status because its precedential value has been significantly undermined by intervening developments, most notably the Third Circuit's *en banc* decision in *Nasir* and panel decision in *Adair*.

An appropriate Order will issue.

Mark R. Hornak
Chief United States District Judge

Dated:  July 8, 2022
Cc:     All counsel of record